RECORD NUMBER: 14-1079

# United States Court of Appeals
### *for the*
# Fourth Circuit

---

**FREDERICK FELT,**

*Appellant,*

– v. –

**MEI TECHNOLOGIES, INC.,**
**DELL SERVICES FEDERAL GOVERNMENT, INC.,**

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

# BRIEF OF APPELLEES

JOANNA LEE FAUST
TIMOTHY JOSEPH MCEVOY
CAMERON MCEVOY, PLLC
11325 Random Hills Road
Suite 200
Fairfax, Virginia 22030
(703) 460-9341

*Counsel for Appellee Dell Services
Federal Government, Inc.*

JOEL JACOB BOROVSKY
TERESA BURKE WRIGHT
JACKSON LEWIS, LLP
10701 Parkridge Boulevard
Suite 300
Reston, Virginia 20191
(703) 843-8315

*Counsel for Appellee MEI
Technologies, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1079          Caption: Felt v. MEI Technologies, Inc., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

MEI Technologies, Inc.
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2. Does party/amicus have any parent corporations?                    ☐YES ☑NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
   If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☑YES ☐NO
      If yes, identify entity and nature of interest:
      Travelers Bond & Financial Products

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _2/7/14_____

Counsel for: _MEI Technologies, Inc._____

## CERTIFICATE OF SERVICE
*******************************

I certify that on _2/7/14_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mitchell I. Batt, Esq.
77 S. Washington St. Suite 300
Rockville, MD 20850

Timothy J. McEvoy, Esq.
CAMERON McEvoy, PLLC
11325 Random Hills Road, Suite 200
Fairfax, VA 22030

_____
(signature)

_2/7/14_____
(date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1079__    Caption: __Felt v. MEI Technologies, Inc., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Dell Services Federal Government, Inc.__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
       (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
       Dell, Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Timothy J. McEvoy _____     Date: ___February 21, 2014___

Counsel for: Dell Services Federal Government _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ___February 21, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Timothy J. McEvoy _____                February 21, 2014 _____
     (signature)                                          (date)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT OF THE ISSUE..............................................................................1

STATEMENT OF THE CASE................................................................................1

    A.    Felt's Employment History ....................................................................1

    B.    Key Personnel on the ESES Contract from 2009-2011. .......................2

    C.    Felt's History of Near-Constant "Protected Activity" .........................3

    D.    Felt Applies For A Job With MEIT ......................................................4

    E.    Felt Files A Formal Complaint With MEIT Alleging Discriminatory
        Failure To Hire ......................................................................................5

    F.    Felt Perceives "Re-Badging" of DSFG Employees To MEIT As
        Further Evidence Of A Plot Against Him ..............................................7

    G.    Felt Demonstrates Consistently Unacceptable Behavior and
        Misconduct In the Months Prior To His Discharge ..............................8

    H.    Felt Is Discharged................................................................................16

    I.    Keyvan Mortazavi and Amir Sadeghi Did Not Play Any
        Role In The Decision To Remove Felt From The Contract................18

    J.    Procedural History...............................................................................22

SUMMARY OF THE ARGUMENT. ....................................................................24

STANDARD OF REVIEW ...................................................................................26

i

ARGUMENT ........................................................................................27

    A. All Of Felt's Claims Should Be Decided Using The Standards Set Forth By The United States Supreme Court In University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013) ...........................................................................27

    B. Regardless Of Whether A Mixed Motive Or Single Motive Standard is Applied, Felt Cannot Prove A *Prima Facie* Case. ................31

        1. Felt Fails to Offer Any Facts to Show That Mortazavi and/or Sadeghi Decided To Terminate His Employment .............31

        2. Felt's "Evidence" That Mortazavi and Sadeghi Were Decision-Makers Is Nonexistent ....................................................33

        3. Sadeghi and Mortazavi Were Well Aware of Felt's Long History of Complaints ...................................................................35

        4. Sadeghi and Mortazavi Also Knew About Felt's Complaint To MEIT In March Of 2010 Raising The Same Issues As Later Contained In His July, 2010 Charge .........................................................................................38

        5. The Factual Record Clearly Shows Ample LegitimateNon-Discriminatory Reasons for Felt's Termination ......................................................................................38

        6. Felt Offers No Other Evidence Of Retaliatory Motive ..................43

    C. Even Had Felt Established A *Prima Facie* Case Of Retaliation, The Evidence Established A Legitimate, Non-Retaliatory Explanation For Felt's Termination ........................................................46

    D. Felt Failed to Preserve His Tortious Interference Claim Against MEIT On Appeal ...............................................................................49

CONCLUSION ....................................................................................49

ii

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................34

*Andreoli v. Gates*,
    482 F.3d 641 (3rd Cir. 2007) .......................................................36

*Byers v. HSBC Finance Corp.*,
    416 F.Supp.2d 424 (E.D. Va. 2006) ............................................27

*Causey v. Balog*,
    162 F.3d 795 (4th Cir.1998) ........................................................34

*Conner v. Schnuck Markets, Inc.*,
    121 F.3d 1390 (10th Cir. 1997) ...................................................34

*Cramer v. Intelidata Technologies Corp.*,
    168 F.3d 481, 1998 WL 911735 (4th Cir. Dec., 31, 1998) ...........48

*Deans v. CSX Transportation, Inc.*,
    152 F.3d 326 (4th Cir. 1998) .......................................................46

*DeJarnette v. Corning, Inc.*,
    133 F.3d 293 (4th Cir. 1998) .......................................................40

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
    145 F.3d 653 (4th Cir. 1998) ................................................27, 34

*Ernest Navy v. College of the Mainland*,
    407 S.W.3d 893 (Tex. App. Houston 14th Dist. 2013)................31

*Evans v. Tech. Apps. & Serv. Co.*,
    80 F.3d 954, 960-61 (4th Cir. 1996)............................................40

*Hawkins v. PepsiCo, Inc.*,
    203 F.3d 274 (4th Cir. 2000), *cert. denied*, 531 U.S. 875 (2000) .................40

*Hemphill v. Aramark Corp.*,
2014 U.S. Dist. LEXIS 39809 (D. Md. 2014) ..............................................31

*Holland v. Washington Homes, Inc.*,
487 F.3d 208 (4th Cir. 2007) ................................................................26, 27

*Hooven-Lewis v. Caldera*,
249 F.3d 259 (4th Cir. 2001) ........................................................................34

*Hughes v. Derwinski*,
967 F.2d 1168 (7th Cir. 1992) ......................................................................34

*Jiminez v. Mary Washington College*,
57 F.3d 369 (4th Cir.), *cert. denied*, 516 U.S. 944 (1995) .....................40, 48

*Jones v. Continental Airlines, Incorporated*,
2005 U.S. Dist. LEXIS 43219 (S.D. Tex. Sept. 14, 2005)...........................37

*Kariotis v. Navistar Intern. Transp. Corp.*,
131 F.3d 672 (7th Cir. 1997) ........................................................................48

*Khan v. State of Maryland*,
213 Md. App. 554, 74 A.3d 844 (2013) .......................................................30

*Kohli v. LOOC, Inc.*,
103 Md.App. 694 (1995) ..............................................................................29

*Laber v. Harvey*,
438 F.3d 404 (4th Cir. 2006) ........................................................................27

*Lee v. Astrue*,
424 Fed. Appx. 262 (4th Cir. April 22, 2011)..............................................40

*Leitgen v. Franciscan Healthcare Inc.*,
630 F.3d 668 (7th Cir. 2011) ........................................................................36

*Maldonado v. Metra*,
743 F. Supp. 563 (N.D. Ill. 1990)................................................................34

*Mallik v. Sebelius*,
    No. PWG-12-1725, 2013 WL 4559516 (D. Md. Aug. 28, 2013) ...........28, 43

*Merritt v. Old Dominion Freight Line, Inc.*,
    601 F.3d 289 (4th Cir. 2010) .................................................................26, 27

*Mittman v. City of Toledo*,
    1998 U.S. App. LEXIS 17656 (6th Cir. July 28, 1998) .........................36, 37

*Nebozuk v. Abercrombie & Fitch Co, et al.*,
    2014 Ohio App. LEXIS 1543 (Apr. 15, 2014) .............................................31

*O'Connor v. Consolidated Coin Caterers Corp.*,
    84 F.3d 718 (4th Cir. 1996) ........................................................................48

*Parlato v. State*,
    76 Md.App. 695, 548 A.2d 144 (1988) .......................................................28

*Phillips v. CSX Transp., Inc.*,
    190 F.3d 285 (4th Cir. 1999) ......................................................................34

*Price v. Thompson*,
    380 F.3d 209 (4th Cir. 2004) ................................................................46, 49

*Richmond v. Oneok, Inc.*,
    120 F.3d 205 (10th Cir. 1997) ....................................................................34

*Rudolph v. Hechinger, Co.*,
    884 F. Supp. 184 (D. Md. 1995) .................................................................48

*Ruffin Hotel v. Gasper*,
    418 Md. 594, 17 A.3d 676 (2011) ...............................................................30

*Tuttle v. McHugh*,
    457 Fed. Appx. 234 (4th Cir. 2011) ............................................................48

*University of Maryland v. Boyd*,
    93 Md.App. 303, 612 A.2d 305 (1992) .......................................................29

*University of Texas Southwestern Medical Center v. Nassar*,
133 S. Ct. 2517 (2013)..............................................................*passim*

**Rules and Statutes:**

29 C.F.R. § 1601.74 .......................................................................29

42 U.S.C. § 1981 ...........................................................................24

42 U.S.C. § 2000 ......................................................................24, 29

Fed. R. Civ. P. 56.........................................................................34

Fed. R. Civ. P. 56(c)....................................................................26

Fed. R. Civ. P. 56(c)(2)...............................................................26

Md. Code Ann., *State Gov't* § 20-1004(c)................................29

Prince George's County Code for Human Relations Division § 2-185(c).............29

**Other Authorities:**

Mazaroff and Horn, *Maryland Employment Law* § 7.01 (2nd ed. 2013).................29

## STATEMENT OF THE ISSUE

Whether, based on the undisputed facts taken in the light most favorable to the Appellant, there is any evidence on which a reasonable jury could find that he was subjected to unlawful retaliation in connection with the termination of his employment.

## STATEMENT OF THE CASE

**A.     Felt's Employment History.**

Appellant Frederick Felt ("Felt"), a White male, was hired by UNISYS in November of 1997 as a Senior Failure Analysis Engineer.  Joint Appendix ("JA") 5, ¶ 7.  UNISYS had been awarded a government contract to provide services to NASA, and Felt was hired to work on this contract.   JA 6, ¶ 9.  Felt was responsible for testing spacecraft parts for failure analysis ("FA") and destructive physical analysis ("DPA").  This testing included both prototype and new parts, as well as parts that had already failed.  JA 6, ¶ 10.

In May 2000, QSS Group Inc. ("QSS") was awarded the contract to which Felt was assigned, which later became known as the Electrical Systems and Engineering Services contract (the "ESES Contract"). JA 6, ¶ 12. Felt became a QSS employee.  *Id.*  In 2005, QSS was replaced by Appellee MEI Technologies, Inc. ("MEIT") as the prime contractor on the ESES Contract, but QSS was retained as a subcontractor. JA 7, ¶ 17.  Felt continued working in his same capacity.  *Id.*

1

On or about January 30, 2007, QSS was purchased by Perot Systems Government Services ("PSGS") and Felt became a PSGS employee. JA 8, ¶ 21. In 2009, PSGS was purchased by Dell Services Federal Government, Inc. ("DSFG"). JA 8, ¶ 21b. Felt continued as an employee of DSFG. *Id.* From 2005 until the end of Felt's employment, therefore, MEIT was the prime contractor on the ESES Contract and DSFG (or its predecessors) was the subcontractor.

**B.    Key Personnel on the ESES Contract from 2009-2011.**

From April 2009 through Felt's termination, Felt reported to Michael Scott, another White male, who was the DSFG Program Manager for the ESES Contract. JA 268-69. However, Scott did not work in Felt's laboratory and was not present on a day-to-day basis. JA 281. From April 2009 through July 31, 2011, MEIT employee Amir Sadeghi ("Sadeghi"), who was present in the laboratory, was the Task Lead for the ESES Contract. JA 291. Sadeghi's supervisor from MEIT initially was Keyvan Mortazavi ("Mortazavi"), then later Dwight Yoder ("Yoder").[1] JA 292. Starting in 2009, the NASA civil servant task monitor for the portion of the ESES Contract to which Felt was assigned was Jean-Marie Denis ("Denis"). JA 293-94.

---

[1] Prior to April, 2009, Sadeghi and Mortazavi were employed by DSFG's predecessor, Perot Systems, and in that capacity were Felt's direct and second-level supervisors (respectively) for several years. In April, 2009, they resigned Perot Systems and joined MEIT. JA 581-2; JA 601-2; JA 641.

2

**C.     Felt's History of Near-Constant "Protected Activity".**

Since 2001, Plaintiff has repeatedly alleged that he was discriminated against in favor of minorities and women.  *See* JA 7-8, ¶¶ 18, 19.  Not once has any court or administrative agency found merit in Felt's claims.

On or about May 18, 2007, when Felt was still a QSS employee, he filed a complaint of discrimination against QSS with the Prince George's County Human Rights Commission ("PGCHRC") alleging that QSS had discriminated against him based on his age (55), gender (male) and race (white), by not promoting him into a management position.  JA 7-8; 33-44; 308-309.  This charge was dismissed with a finding of "no cause" on November 30, 2007.  JA 308-309.

On March 26, 2008, Felt filed a lawsuit against MEIT and QSS alleging the same claims as his 2007 charge.  ("First Lawsuit")  JA 46-55.  After Felt's attorney withdrew, Felt voluntarily dismissed the First Lawsuit on October 20, 2009.  JA 260.

Felt next filed a charge of discrimination with the PGCHRC against MEIT on September 10, 2008.  This time he alleged a hostile work environment.  JA 8; 308-309.  This charge was also found to be without merit, and was dismissed with a finding of "no cause" on July 15, 2009.  JA 72-73; 308-309.  Felt also filed at least two complaints of discrimination against NASA.  JA 315-16.

3

**D.    Felt Applies For A Job With MEIT.**

In the fall of 2009, due to workload issues, NASA determined that a fourth failure analysis engineer was needed in the NASA Goddard Space Flight Center laboratory where Felt worked in Greenbelt, Maryland.  JA 103-5; *see also* JA 89. The position posted was virtually the same as Felt's existing position, except that the new employee would be an employee of MEIT rather than DSFG.  JA 103-5. Felt applied for the new position.  JA 103-5.[2]  At his deposition, Felt admitted that had he been hired for the new position, then another vacancy would have been created in *his* position which would then have to be filled.  JA 121; s*ee also* JA 90. Indeed, because the new position and Felt's position were so similar, and because Felt had long-served as a failure analysis engineer, he was asked to write the job description for the new role, and he even helped to interview candidates for the position.  JA 116, 118.  Felt would later claim that being asked to write this job description was "unusual and threatening."  JA 146 ¶ 23.

Felt was not interviewed for the new position.  Instead, MEIT hired Ahmed Amin, who is African-American (JA 146 ¶ 23). In an email to his wife, Felt described Amin as "a minority candidate," and complained that "the black" [Amin] had only been put in place to monitor him.  JA 345.  Felt quizzed MEIT's then-

---

[2]  As an aside, it does not help Felt's cause that Felt was seeking employment with an entity that he now contends sponsored serially discriminatory actions against him, including serial acts of retaliation.

4

local HR Manager, Deirdre Dietz, as to the reason why he had not been interviewed. JA 78-79; *see also* JA 103-5.[3] Felt was told that he was not interviewed due to an "agreement . . . with QSS [DSFG] regarding hiring our teaming partners' employees." JA 78-79; *see also* JA 103-5. In other words, Felt was told he was not eligible to be considered because QSS and MEIT, which were working collaboratively for a common client (NASA), had agreed not to hire the other's employees. *Id.*

## E.    Felt Files A Formal Complaint With MEIT Alleging Discriminatory Failure To Hire.

Felt next filed a formal complaint with MEIT's Director of Human Resources, Sandra Stanford ("Stanford"), who works at company headquarters in Houston, Texas. JA 139-41; 103-5. Felt claimed that the decision to deny him an interview was part of a "pattern of discrimination and harassment" and that MEIT's Sadeghi and Mortazavi were to blame; he also claimed the decision was retaliatory. JA 139-41. Stanford promised a full investigation and scheduled a trip to Greenbelt to meet with Felt and others. JA 79; *see also* JA 139-41. Felt

---

[3] Felt was obsessively focused on the status of the new position relative to his own. He repeatedly asked Dietz and others whether the new position was "parallel, superior or subordinate" to his. JA 78-9; JA 145 ¶ 24. Felt later alleged that MEIT refused to answer this question. He contended that this "show[ed] MEI['s] collaboration with the government and [the] prior knowledge of MEI and government of my impending dismissal" (JA 146-7 ¶ 24), and that the new position was part of "their" preparations "to dismiss me." JA 146 ¶ 23. However, Felt acknowledged at his deposition that MEIT had answered his question about the position (JA 103-5; JA 119).

refused to meet with Stanford, however, or even speak with her by phone.[4]
Instead, he told her that "if you wish to ask questions you may send them and
allow me the time to consider them carefully and consult with counsel, if
necessary." JA 139-41. Felt added:

> I can also assure you that I do not want to conduct a one-sided interview. I would expect MEI to share information. So please do not schedule a trip on my behalf, it is not necessary, and ***I do not wish to be intimidated further by MEI personnel***.

JA 139-41 (emphasis supplied).[5]

As a result of Felt's refusal to cooperate, Stanford conducted her
investigation without Felt's input. JA 103-5. She interviewed Sadeghi, Mortazavi
and others in March 2010; each witness learned of Felt's informal complaint at that

---

[4] Stanford first asked if she could phone Felt on March 31, 2010. JA 139-41. Felt stated he would be "out of the office" that day, so he asked Stanford to send her questions via email. JA 139-41. Stanford offered to speak with him over the phone at his convenience. JA 79; *see also* JA 139-41. Felt finally admitted he was unwilling to speak with her, as stated in the text.

[5] In his interrogatory responses and at his deposition, Felt claimed that he only refused to talk with Stanford because he had "previously experienced harassment from managers" at MEIT's offices and did not want to visit there again. JA 79. However, upon further questioning, Felt reluctantly admitted this explanation was false: Stanford had offered to interview him by phone, which would not have required Felt to visit MEIT's offices. Nonetheless, Felt still refused to talk with her. JA 135-6.

time.[6]  *Id.*  Stanford found no reason to conclude that Felt had been subjected to discrimination, harassment or retaliation in connection with the hiring process for the position.  *Id.*

On July 28, 2010, Felt filed a complaint of discrimination with the PGHRC against MEIT (but not DSFG) arising out of his non-selection for the position received by Ahmed Amin.  JA 151.  Felt again alleged retaliation, this time claiming he was not selected due to his having filed a charge of discrimination against MEIT in September, 2008.  JA 151.  The July 28, 2010 charge, like the others, was dismissed with a finding of "no cause" on November 23, 2011.  JA-308-309.

**F.    Felt Perceives "Re-Badging" of DSFG Employees To MEIT As Further Evidence Of A Plot Against Him.**

In January, 2011, several DSFG employees were "rebadged" (transferred) from DSFG to MEIT in order to meet MEIT's contractual obligations to maintain a certain number of MEIT personnel on the ESES Contract.  JA 96-7.  Felt was not one of the "rebadged," employees. "The main reason was that [DSFG] wanted a core capability in DPA [destructive physical analysis] and [Felt] was the most senior individual and they wanted to keep him in Dell for that reason."  JA 96 (testimony of Dwight Yoder), 156-62; JA 155-56.  Further, because of Felt's

---

[6] Felt's March 2010 internal complaint alleges the same retaliation claims that he later raised in the July 2010 charge.

seniority, he was very profitable to DSFG.  JA 263.  Accordingly, DSFG did not want to lose Felt to MEIT.

When a meeting was held to announce the change to the affected employees, Felt was not asked to attend, because he was not being rebadged.  Felt later claimed that the meeting may have been deliberately planned for his day off.  JA 122-3.  Felt also complained that he was "not allowed" to attend the meeting.  JA 9.[7]

### G.  Felt Demonstrates Consistently Unacceptable Behavior and Misconduct In the Months Prior To His Discharge.

Throughout the period of 2007-2011, Felt's performance reviews "remained low" even though he had different supervisors.  JA 288.  In fact, Felt's supervisor, Michael Scott, described Felt as his "number one personnel issue" and had "chronic issues" with Felt's performance.  JA 274; 277.  Scott had to deal with complaints from MEIT about Felt "every month or two months."  JA 274.

For example, Scott received complaints that Felt did not observe a set schedule, and that he did not document his whereabouts in the lab as required by MEIT policy.  JA 274.  In addition, in or about June 2010, NASA made a routine

---

[7]  In his Amended Complaint, Felt asserted that "no reason was provided" at the time for not transferring him to MEIT.  JA 9.  At his deposition, however, Felt admitted that he had been told that DSFG wanted to retain him as a subject matter expert.  JA 124-5; *see also* JA 92 (Sadeghi Dep.) ("if you have to let go of some people, you keep the best ones" and testifying that Felt "absolutely" was a subject matter expert in failure analysis).

request that all contractors track government property and provide an update with the property's whereabouts. JA 274. Felt not only refused to comply with an inventory survey requested by the NASA Lab Manager, but also claimed that the initial documents that showed his signature when the equipment was assigned had been "forged." JA 274; 330. As a result, Scott had to sign for Felt, which he described as a "difficult" ordeal. JA 274. Scott said there "was a lot of struggle sometimes [with Felt] just doing day to day things." JA 274.

In the months prior to his termination, Felt continued to display inappropriate conduct. On October 19, 2010, Production Control Manager Denise Ratliff sent a routine request to Felt requesting training on a piece of equipment in the lab (a Pernicka leak detector). JA 164-6.[8] Ratliff copied Denis and Sadeghi. *Id.* Instead of complying with Ratliff's legitimate request, Felt lashed out and refused to provide the required training. He wrote:

---

[8] Ratliff is a non-managerial employee with no technical background, who is responsible for scheduling the jobs that come into the lab, ensuring calibration of equipment, following up on safety issues, and making sure everyone receives necessary training. JA 169-70. Ratliff sent this email after some of the lab personnel had complained that they did not have sufficient training to interpret the data from the Pernicka equipment. JA 172-3. Denis, who is MEIT's NASA contact and therefore its customer, instructed Ratliff to send Felt this email. JA 173-7.

> The dictatorial tone of the email below appears to be a reprisal and threat, ***no doubt related to discrimination in the workplace***. ***The distribution list provides evidence of a nexus of government, contractor, and subcontractor personnel. It would seem an apology and other consideration is due***. [Emphasis added]

JA 164-6. *See also* JA 128-9. Naturally, Ratliff felt "upset" and "riled" by Felt's email. JA 178. The message was forwarded to Scott, who found it to be "inappropriate." JA 273. Scott "emailed [Felt] and said, 'we need to sit down,' and [Felt] responded back, 'I do not, I will not meet with you.'" JA 273; 336. In the end, Felt refused to perform the requested training. JA 287.[9]

Felt ultimately admitted that he had no basis for his speculation that the training request was part of a larger plot by the government and the two contractors to set up his termination. Indeed, Felt admitted that he had no idea whether Sadeghi or Denis had asked Ratliff to send the email, or whether the NASA customer believed that, in fact, more training on the Pernicka equipment was needed. JA 128. Contrary to Felt's unsupported belief that Ratliff was "in" on a plot to oust him, Ratliff was not even aware that Felt had filed a charge of discrimination in 2010 until *after* Felt was terminated. JA 171.

---

[9] On November 4, 2010, ten days after Felt sent the email above, Sadeghi, Ratliff, and Denis had held a meeting with some of Felt's coworkers to ask them what training they had received from Felt on the Pernicka and what training they thought they needed. JA 72. Felt claims this meeting was "hostile and conspiratorial" because he "was never invited" to the meeting. JA 147.

In February, 2011, Felt traveled by plane to New Mexico, and then was supposed to travel to Santa Clara, California to visit a Neocera facility to test a part he was carrying with him on the plane. JA 130. Felt contended that the Neocera representative canceled the appointment after Felt was already in New Mexico, because he "apparently was running late in his schedule. He was returning from Malaysia." JA 131; *see also* JA 192 (Email from Frederick Felt to Amir Sadeghi dated February 16, 2011 alleging that "the Neocera representative was on travel in Malaysia the preceding week and unsure whether he would return on Monday.")

Felt lied. After reserving the Neocera equipment in advance for February 14, 2011, Felt contacted the equipment operator on Saturday, February 12, and attempted to cancel the appointment by claiming that February 14 was President's Day. JA 187. The operator, Jan Gaudestad, informed Felt that President's Day was February 21, and told Felt he was flying back from Malaysia on Sunday, February 13, to be back in time for Felt's appointment the next day. JA 186-7. Felt then asked if he could instead use the equipment for three hours/day for the rest of the week, but Gaudestad told him the machine was booked for Tuesday, February 15. *Id.* Felt then canceled his February 14 appointment and flew home.

Denis, the point of contact with NASA, was unhappy to find that Felt had not gone to Santa Clara for his appointment at Neocera. JA 189-90. He wrote:

> I need to have explanations regarding the reasons pertinent to Mr. Felt['s] travel plan[s] to perform Magnet Current Imaging at Neocera in Santa Clara CA. Mr. Felt was supposed to be at Neocera today, instead, he is here at GSFC. According to a conversation that took place between Mr. Felt and the Production Control Manager [Ratliff] earlier today, his plan has been changed due to Neocera not able to accommodate him and the testing is postponed until the end of February.

JA 190.

Due to Neocera's schedule, Felt's appointment could not be rescheduled until late February or early March. JA 192. Because he canceled his appointment, Felt was again required to fly across the country at government expense, delaying this time-sensitive project and losing additional work time. JA 192.

Denis also learned, during a meeting with Felt and a Zeiss representative, that an expensive piece of equipment (the Zeiss SEM "backscatter") had been broken for about a year. As Denis said during the meeting:

> Mr. Felt reported to us that the backscatter has been broken for about a year. I would like to know why this was not reported to me or Ms. Ratliff . . . . To my understanding every equipment owner is responsible to report break downs, schedule maintenance, train other lab personnel and any other related issues to the Production Team, thus making me aware of such issues for immediate actions.

JA 189-90. Felt was the "owner" (*i.e.,* responsible party) for the backscatter. JA 134.

To respond to Denis' concerns, Sadeghi asked Felt to explain the circumstances relating to the broken detector. JA 194-6. Felt alleged that he had "repeatedly brought this issue to the attention of lab management."[10] JA 194-6. Rather than answer Sadeghi's questions, Felt deflected the issue, complaining about "the incompetence of management and an inability to understand technical issues." JA 194-6. Sadeghi again asked Felt to answer his questions, and Felt complained, "quite honestly, it appears that your emails constitute another reprisal." JA 194.

Felt alleges that he orally informed Ratliff of the broken equipment but she "elected not to" repair it. JA 113. Ratliff told Sadeghi she did not recall ever being informed that the backscatter was broken. JA 183-4. She also testified that she never recalled Felt reporting the broken equipment: "Q. Do you have any recollection of Mr. Felt having come to you and reported the broken detector? A. I

---

[10] Plaintiff often accuses unnamed "lab management" of taking a variety of actions against him, without identifying the persons to whom he is referring. He also claims that he was often "attacked" by unnamed "people who were part of the discrimination and benefitted therefrom." JA 144 ¶ 10. He alleges that he "observed actions by government and contractor management over a period of months, which led me to believe they were making collaborative preparations to dismiss me. . ." JA 145 ¶ 19. When an administrative assistant in the lab, Kristen Washington, asked to have her hours changed for personal reasons relating to child care, Felt believed her hours had been changed so she could monitor him during the early hours in the lab. JA 10 ¶ 24E; JA 74; JA 179; JA 199-200. In short, Plaintiff regularly believed that unnamed individuals in his workplace were conspiring to fire or harm him.

do not. " JA 179-80.  Felt admitted that he never informed Ratliff via email or in writing that the equipment was broken, instead insisting there was no "policy" requiring him to do so.  JA 114.

Sadeghi concluded that since Production Control (Ratliff) had nothing in writing from Felt reporting the broken equipment, protocol was not followed.[11]  JA 93.  As the "owner" of this piece of equipment, Felt was held responsible for its state of disrepair.  Felt protested that he should not have been blamed for the broken equipment.  He asserted that having the equipment sit broken for several months was not a significant issue.  He argued that the broken detector was used "less than 1% of the time" and that there was another detector in the lab that was "in working order."  (JA 70).  He also claimed it "makes no sense that [he] would be terminated over such a reason." JA 70-1.  He argued that the "negative impact of this alleged action was negligible in comparison to the positive impact of my performance." JA 71.

On March 23, 2011, NASA issued the technical portion of its Fee Award Letter, a document that was essentially the government's performance appraisal for

---

[11] Felt's brief asserts that the Zeiss service records show the repair company was aware of the broken detector for a year.  Felt offers no admissible evidence to show whether or how these records relate to the specific broken detector at issue here.  Further, Felt offers no admissible evidence to show that Ratliff ever received the service records.  Felt Appeal Brief at 10.

MEI. JA 349; 354. Areas of deficient performance could directly result in a lower fee for the contractor. JA 353.

Among other things, the Fee Award Letter cited MEIT for Task #14, which involved the backscatter. The Fee Award Letter specifically criticized MEIT for the failure to "communicate [a] breakdown of equipment to [the] team." JA 350. Any issue specifically cited in a Fee Award Letter is considered a very serious issue. JA 261; 352. Yoder noted that:

> anytime weaknesses of any magnitude shows up and particularly when it's addressing an individual, it's a significant issue in the government's eyes.

JA 352. Yoder testified that the backscatter issue undoubtedly affected the fee award received by MEIT from the NASA customer for the quarter at issue. JA 100-1. Although it was impossible to quantify the magnitude of the damage, Yoder noted that the scores for technical performance, which would include this issue, were relatively low. *Id.*

Asked to characterize Felt as a whole, Scott stated that "there [were] two aspects to [Felt's] performance in his role. The first one is his technical abilities, which are significant . . . . The second aspect of his performance is his ability to fit

15

into an overall system.  And he struggled to do that and he did not . . . . you need to fit into a team atmosphere and some people don't."  JA 274.[12]

## H.    Felt Is Discharged.

In or around February 2011, Scott approached DSFG's General Counsel, James Rittinger ("Rittinger"), to report problems with Felt's performance.  JA 260; 300.  At no time during Felt's employment with DSFG was Scott aware that Felt had filed the charge of discrimination against MEIT in March 2010.  JA 272.  Scott told Rittinger that Felt regularly was "insubordinat[e]."  JA 261.  Scott also told Rittinger that MEIT and NASA were not pleased with Felt's performance.  JA 261.  Rittinger instructed  Scott to document any issues with Felt and report them to DSFG Human Resources in order that Human Resources could determine whether it was appropriate to discipline Felt by, for example, putting him on a Performance Improvement Plan.  JA 261.

On March 17, 2011, MEIT's General Counsel Barbara Pearson contacted Rittinger by email to request a telephone meeting.  JA 261.  That call took place on or about March 22, 2011.  JA 261.  Ms. Pearson reported that, due to Felt's negligence, the government had cited the backscatter issue in the Fee Award

---

[12] Plaintiff also claims that he was wrongly accused of being absent from the office without notice, refusing to write his whereabouts on the lab white board, and similar issues.  *See* JA 146 ¶¶ 20-21.  He also alleges retaliation based on the fact that he experienced "chronic physical discomfort" due to a bump in the floor under his desk, as to which "the government" did not take prompt action. JA 146 ¶ 22.

16

Letter, and had subsequently penalized MEIT by reducing its fee award.  JA 261.[13]

According to Rittinger, Ms. Pearson reminded him that under the subcontract between DSFG and MEIT (JA 367),[14] DSFG had an affirmative obligation to remove an employee from the ESES Contract at the request of MEIT, and that MEIT would like Felt to be removed.  JA 262.  While Pearson does not dispute talking to Rittinger, or discussing MEIT's right to request removal of personnel, she does not recall asking for Felt to be removed from the ESES Contract.  JA 363.

DSFG policy provided that there had to be a justification for removing someone from a contract.  JA 262.  As a consequence, during the March 22, 2011 telephone call, Rittinger requested that MEIT provide DSFG with a list of Felt's performance issues that MEIT had experienced.  JA 262; 361.  Rittinger also requested that MEIT forward DSFG the excerpt from the Fee Award Letter.  JA 262.  Rittinger reviewed the Subcontract and confirmed that DSFG had an obligation to remove an employee from the Subcontract at the request of MEIT.  JA 262.  Rittinger also reviewed a copy of Felt's 2011 Performance Review, which was based on Felt's 2010 work.  *Id.*  JA 371.  The 2011 Performance Review cited Felt for absences, failure to follow lab protocol, failure to report equipment

---

[13]  DSFG was not impacted by the Fee Award reduction as its compensation was not dependent on the Fee Award Letter.  JA 262.

[14] The Subcontract was designated as Confidential when produced.  Therefore, a redacted excerpt with the relevant portion is provided hereto.  If it becomes necessary, DSFG will produce the unredacted Subcontract under seal.

failures, behavior inconsistent with the DSFG Code of Conduct, and insubordination.  JA 371.

Rittinger contacted Shannon Hussion, the DSFG Human Resources liaison working on the Felt matter, and instructed her that DSFG had an affirmative obligation to remove Felt from the ESES Contract pursuant to the Subcontract.  JA 263 – 264.  Hussion confirmed that there were no open positions for Felt.  JA 264.  Since there was no position available for Felt's specialized skills, Felt was to be terminated without cause and offered a work force reduction package, which signifies that Felt was still in good standing and eligible for rehire.  JA 263.

Both Rittinger and the HR liaison communicated these facts to Scott, who then informed Felt.  JA 265.  Felt recalled that he met with Scott and a "HR representative" from DSFG who told him he was being removed from the ESES Contract and that, because there was no other position for him, he was being terminated without cause.  JA 313.  On April 8, 2011, Felt was discharged by Scott.  JA 10 ¶ 25; JA 115.

# I.    Keyvan Mortazavi and Amir Sadeghi Did Not Play Any Role In The Decision To Remove Felt From The Contract.

Felt's theory of the case is that Sadeghi and Mortazavi were responsible for his ultimate removal from the ESES Contract, and that this led to his termination from DSFG.  This is because it is undisputed that Sadeghi and Mortazavi learned of Felt's July, 2010 charge shortly before his discharge, and all other key personnel

at MEIT knew of Felt's charge months earlier. Felt recognizes that there is too long a time lapse between his July, 2010 charge and his discharge to support a claim of retaliation – so he points to Sadeghi and Mortazavi as key decision-makers in order to argue that their discovery of his charge was in close proximity to his termination. However, other than his speculation, there is absolutely no evidence to support Felt's theory that Mortazavi and Sadeghi had anything to do with his termination. Based on the undisputed facts taken in the light most favorable to Felt, no reasonable jury could possibly find that Mortazavi and Sadeghi played such a role.

Sadeghi testified that he understood the termination decision had been made by "the program manager for Dell at the time, Scott, Mike Scott." JA 583-4. Sadeghi elaborated:

> He [Scott] came into my office and he told me that it's going to be Mr. Felt's last day, and based on some internal reviews, they have decided to finalize and terminate his employment with Dell.

JA 585. Sadeghi also testified that he was "surprised, but nevertheless, Dell was its own company, and they made their own decisions, and that was it. I didn't have a whole lot of say in it." JA 586. Mortazavi testified that he had "no idea what exactly took place" when Felt was fired, did not know who made the decision, and believes he learned about it after the fact. JA 614-5. In fact, seven current and former MEIT witnesses testified, and ***none*** said that Sadeghi or Mortazavi made

19

the termination decision. These facts are undisputed, because Felt has offered no facts that contradict them.

Additionally, in the weeks leading up to Felt's removal from the ESES Contract, numerous emails show Sadeghi and Mortazavi were peripheral to the decision-making process:

- On March 9, 2011, Mortazavi emailed Yoder, Sadeghi, and local HR Manager Deirdre Dietz, stating, "Mike Scott and I are in agreement that at this point *we need our corporate attorneys and upper management to talk and arrive at a solid solution and implementation plan.* JA 618 (emphasis supplied).

- On March 16, 2011, Yoder emailed Stanford and stated, "Mike [Scott] agrees that *MEIT and Dell HR and Legal should discuss and provide our path forward.*" JA 623 (emphasis supplied).

- On March 18, 2011, Sadeghi emailed Stanford stating, "I have not completed the document you requested from me in regards to performance deficiencies by Mr. Felt." On Sunday, March 20, Sadeghi sent the requested information to Stanford, stating, "Please see the attached document in regards to issues with Mr. Felt dating back to 2006." JA 630.

- Stanford sent the information compiled by Sadeghi to Pearson on March 30, who sent it to Rittinger on March 31. JA 633-4.

As shown above, Sadeghi was barely involved in any discussions regarding Felt's performance – his sole job was compiling information as directed by Stanford. *See* JA 599 (Sadeghi Dep. - "I believe the discussion between MEIT and Dell was not something I was privy to. I was told that perhaps we need to provide some information.").

20

Mortazavi was even less involved in this process. In an email to Stanford and others dated March 30, Mortazavi said:

> I think we are losing focus as to why we assembled [the information about Felt gathered by Sadeghi]. Based on our telecon a few weeks ago, we were to generate this document ***for you and others at HQ as the basis of discussion between MEIT and Dell*** . . . We are ***reaching out to our HQ experts for help in getting this matter resolved*** quickly so that we (the workers) can attend to our program here in [Maryland] . . . ."

JA 636 (emphasis supplied). It was apparent that Mortazavi was not, and did not expect to be, involved in any decisions regarding Felt. *Id.* Instead, he expressly stated that he expected "our HQ [headquarters] experts" to resolve the matter.[15] *Id.*

Finally, although Mortazavi and Sadeghi may have only learned of Felt's July, 2010 charge in March of 2011, they certainly were aware of Felt's long history of internal and external complaints and lawsuits alleging discrimination and retaliation, dating back to 2007. There is no reason to believe that, knowing of this history, Sadeghi and Mortazavi would suddenly decide to retaliate against Felt in 2011. Sadeghi testified as follows:

---

[15] Felt contends that "[a] fair reading of this email suggests Keyvan was not interested in working with Dell to correct any alleged performance deficiencies, but, rather, wanted to resolve matters related to Felt 'quickly.'" Felt Appeal Brief at 26. Even if Mortazavi was not interested in working to correct performance deficiencies, Felt does not show how wanting to resolve matters quickly relates at all to Mortazavi having a retaliatory intent. In fact, Felt's contention shows that quite the opposite is true. The email shows Mortazavi simply wanted to get back to work and have the "HQ experts" resolve the matter – further negating Felt's claim that Mortazavi was a decision-maker. JA 636.

> Q:   While Mr. Felt was still working, did you have knowledge that he had filed such a charge [against MEIT alleging non-selection]?
>
> A   Well, to be honest, there were several cases back and forth. I was never privy to the nature of the case and which county, which state, but throughout the past few years, I've been providing the same type of answers in regards to performance and activities in the lab.
>
> So I'm not sure which one corresponds to what, but I believe there's been more than one case.

JA 587. Similarly, Mortazavi testified, "Mr. Felt, during my knowing Mr. Felt with QSS, Perot and MEI Mr. Felt has claimed, has put together and filed so many different claims that I just don't know which one I'm referring to here… at any moment Mr. Felt had multiple claims against government, QSS, Perot, MEI.  So I don't know which one I was referring to, because he had multiple at all times."  JA 609. In fact, Mortazavi testified at his deposition that he did not even recall being aware that Felt had filed a discrimination charge against MEIT as a result of his non-selection for a failure analysis position posted by MEIT.  JA 610-12.

## J.    Procedural History.

On April 12, 2011, Felt filed a complaint against DSFG with the PGCHRC alleging that his termination constituted unlawful retaliation for his prior complaints of discrimination and retaliation, the last of which had been filed more than eight months earlier.  JA 11.  Felt did not allege that his removal from the

22

ESES Contract was retaliatory. JA 11. Like the prior three charges, the new charge was dismissed with a finding of "no cause." JA 11.

On September 12, 2011, Felt filed a complaint against MEIT with the United States Equal Employment Opportunity Commission ("EEOC") raising the same allegations of retaliation as he had against DSFG. JA 11. This fifth discrimination charge was dismissed with a finding of "no cause" on May 30, 2012. JA 12. Felt subsequently filed suit against both MEIT and DSFG.

On November 15, 2013, MEIT and DSFG each filed Motions for Summary Judgment which subsequently were fully briefed. On December 31, 2013, the district court granted summary judgment in favor of MEIT and DSFG and dismissed Plaintiff's complaint in its entirety. The district court determined that nothing in the record supported Felt's contention that either Mortazavi or Sadeghi made the decision to terminate his employment and that ample cause to terminate Felt's employment existed, regardless of who made the final decision. JA 26-28. The Court found that the passage of time (over eight months) between the filing of Felt's EEO charges and his discharge did not give rise to any inference of retaliation, and that Felt had not adduced any evidence to support his claims.

In a summary of the basis for his decision, Judge Motz stated as follows:

23

> In the final analysis this case turns upon the fundamental proposition that an at-will employee cannot, in effect, obtain tenure by being constantly disgruntled and filing a series of employment discrimination complaints. Rather, his employment turns on his performance, and here MEI and Dell were entitled to conclude that Felt's performance was unsatisfactory.

JA 28.

## SUMMARY OF THE ARGUMENT

Felt alleges that MEIT required or procured his termination from DSFG in retaliation for his 2010 charge of discrimination eight months earlier. This charge challenged his non-selection for the position ultimately received by Ahmed Amin (an individual Felt referred to as "the Black"). Felt's claim is based on federal, state and local law.

In Counts I-IV of his Amended Complaint, Felt alleges that MEIT retaliated against him in violation of Title VII of the Civil Rights Act of 1964, the Maryland Human Relations Act, the Prince George's County Code, and 42 U.S.C. Section 1981, respectively. In Counts V-VIII of his Amended Complaint, Felt alleges retaliatory termination against him on the part of DSFG in violation of Title VII of the Civil Rights Act of 1964, the Maryland Human Relations Act, the Prince George's County Code, and 42 U.S.C. §1981, respectively. In Count IX of his Amended Complaint, Felt alleged tortious interference with economic expectations against MEIT.

24

Based on the undisputed facts in this case – primarily Felt's own testimony, affidavit, interrogatory responses and emails – there simply is no way any reasonable jury could conclude that MEIT or DSFG retaliated against Felt.[16]  First, Felt's entire appeal is premised in the first instance on Sadeghi and/or Mortazavi acting as decision-makers.  However, the undisputed evidence shows they were not decision-makers and were only tangentially involved.  Second, there is insufficient temporal proximity between Felt's first incidents of protected activity – in 2007 and 2008 – and his termination.  His lengthy history of "protected activity" also belies his retaliation claim – if MEIT or DSFG were inclined to retaliate against him, there is no reason they would wait four years to do so. Third, even if the Court looks only at Felt's most recent "protected activity" – his July, 2010 charge – there is still too much of a time lapse between that activity and his termination in April, 2010 to support his claims.  Fourth, there are no facts upon which a jury could rest a conclusion that Felt's discharge was for anything other than legitimate, nondiscriminatory reasons. Finally, Felt offers no other evidence of retaliatory motive.

---

[16] For purposes of the underlying motion for summary judgment only, MEIT will assume that it can be held liable to Plaintiff as an "employer" as required under the statutes upon which his claim is based. However, if the lower court is reversed and this case proceeds to trial, MEIT will introduce evidence showing that it cannot be held liable to Plaintiff under any of these statutes because it was not his "employer" in any respect.

Instead, the very clear record in this case shows that Felt alleges retaliation because he perceives every minor workplace issue, every innocuous email, and every routine meeting as a retaliatory or conspiratorial act.  A simple email asking Felt to provide training to his colleagues, a request that he meet with an MEIT investigator to investigate his claims, and a request that he leave a meeting that does not even involve him all are viewed by Felt as sinister and retaliatory.  Felt even views issues wholly unrelated to him – like bumps in the floor, other employees' work schedules, or the decision to hire another Failure Analyst to work in the lab – as evidence that unnamed "lab management" was out to get him.[17]

For all of these reasons, this Court should affirm the lower court's grant of summary judgment.

## STANDARD OF REVIEW

The Fourth Circuit reviews summary judgment decisions on retaliation claims *de novo*, applying the same standard as the district court.  *See* Fed. R. Civ. P. 56(c); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). Under that standard, summary judgment is appropriate when "there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c)(2); *Merritt v. Old Dominion Freight Line,*

---

[17]    Felt's Amended Complaint alleged MEIT tortiously interfered with his employment with DSFG.  Felt's appeal fails to raise any issue with the lower court's grant of summary judgment on that claim.  Accordingly, that claim is not preserved on appeal, and this Court should affirm the dismissal of that count as well.

*Inc.*, 601 F.3d 289, 295 (4th Cir. 2010). Therefore, summary judgment may be granted when there is insufficient evidence for a jury to return a verdict in favor of the nonmoving party. *See Holland*, 487 F.3d at 213.

## ARGUMENT

**A.  All Of Felt's Claims Should Be Decided Using The Standards Set Forth By The United States Supreme Court In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013).**

In *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006), the Court held that:

> To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse action.

(internal citations omitted); *see also Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  For purposes of this appeal, MEIT and DSFG do not dispute that Felt engaged in protected activity and that adverse action was taken against him.  However, "even if a protected activity and adverse employment action are shown, the employee must satisfy the causation element to establish a *prima facie* retaliation case.  The employee must show that the adverse employment action took place after the protected activity ***and because of the protected activity***."  *Byers v. HSBC Finance Corp.*, 416 F.Supp.2d 424, 438 (E.D. Va. 2006) (internal citations omitted) (emphasis supplied). *See also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

27

Recently, the U.S. Supreme Court held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Under *Nassar*, it is insufficient merely "to show that the motive to [retaliate] was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id*. at 2523. To establish a "but-for" causal relation, a plaintiff now must prove that "the desire to retaliate was the 'but-for' cause" of the adverse action taken against him. *Id*. at 2528. For example, in *Mallik v. Sebelius*, No. PWG-12-1725, 2013 WL 4559516, at *29-*30 (D. Md. Aug. 28, 2013), the plaintiff alleged his supervisor had treated him badly both before and after he lodged a complaint of discrimination. The *Mallik* Court, relying on the *Nassar* decision, held that his complaint of discrimination did not cause a change in his supervisor's behavior; therefore retaliation could not be the "but-for" cause of the supervisor's actions. *Id.* at *30. In sum, therefore, *Nassar* significantly raised the bar for plaintiffs pleading federal retaliation claims.

*Nassar*'s heightened standard should apply to Felt's state court claims as well. Courts in Maryland have long-recognized that, as a general matter, federal and state antidiscrimination laws are part of a common rubric. *See, e.g., Parlato v. State*, 76 Md.App. 695,705, 548 A.2d 144, 149 (1988) (state and local laws are

28

components "in a comprehensive national civil rights enforcement scheme"); Md. Code Ann., *State Gov't* § 20-1004(c) (providing that timely filed EEOC charges are automatically construed as timely for purposes of the Maryland Commission on Human Relations); Mazaroff and Horn, *Maryland Employment Law* § 7.01, p. 7-4 (2nd ed. 2013) ("Maryland courts have held that neither [federal] Title VII nor [Maryland] Title 20 preempt the field of discrimination law, leaving the State of Maryland and county and city governments to enact their own supplemental, *but not inconsistent*, laws in this area") (emphasis added); 29 C.F.R. § 1601.74 (designating Maryland Commission on Human Relations and Prince George's County, Maryland as jurisdictions authorized to process federal discrimination claims pursuant to work-sharing agreements).[18]  Accordingly, all of Felt's claims, regardless of whether brought under Title VII or state and local statutes, should be analyzed using the Supreme Court's recent precedent in *Nassar.*

---

[18] Given these close relationships, Maryland courts have routinely looked to federal law for guidance when construing similar state and federal EEO laws.  Because Maryland's Human Rights Act is modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*, *see University of Maryland v. Boyd*, 93 Md.App. 303, 314, 612 A.2d 305 (1992), the Court may look to federal case law interpreting Title VII in analyzing discrimination and retaliation claims under the Maryland Code.  *See Kohli v. LOOC, Inc*., 103 Md.App. 694, 714, n. 7 (1995).  Similarly, under the Prince George's County Code, "it is intended that the prohibitions in this Division are substantially similar… to prohibitions in federal and State law." Prince George's County Code for Human Relations Division § 2-185(c).

Felt's brief asserts that since Maryland courts have not yet ruled on whether the Supreme Court's decision in *Nassar* applies to state and local discrimination claims, this Court should not apply that ruling. He cites *Ruffin Hotel v. Gasper*, 418 Md. 594, 611, 17 A.3d 676, 686 (2011) for this proposition. However, in *Ruffin*, the Maryland Court of Appeals looked to its own cases *which had, in turn, relied persuasively on federal Title VII precedent* to find that in "Maryland . . . a plaintiff's burden is to prove that the exercise of his or her protected activity was a 'motivating' factor in the discharge." *Id.*[19] However, *Ruffin Hotel* was decided two years before *Nassar*. No Maryland appellate court has addressed how *Nassar* should apply to Maryland's antidiscrimination laws, which as noted have historically been interpreted in harmony with federal statutes in light of the interlocking state/federal antidiscrimination relationship and for reasons of public policy. Accordingly, it is highly likely that *Nassar* would be followed in Maryland if the question were to be presented today.

Indeed, in the context of a *Batson* challenge, the Maryland Court of Special Appeals has heavily (and recently) criticized the same mixed-motive analysis decried by *Nassar*. *See Khan v. State of Maryland*, 213 Md. App. 554, 571 n.3, 74 A.3d 844, 853 n.3 (2013) (determining "that the mixed-motive test presents severe

---

[19] Under the "motivating" factor test, a Plaintiff could attempt to prove his case by showing that retaliatory motivations were one of several "motivating" reasons for adverse action instead of being "the" motivating reason.

conceptual problems . . . . The entire mixed-motive analysis is premised upon the challenger's race-neutral reason being a motivating factor, but somehow not motivating enough to cause the strike when the race-based reason is 'subtracted' from the decision to challenge. As a practical matter, we cannot imagine how a trial court could make such a determination[.]"). The federal District Court for the District of Maryland recently applied the *Nassar* analysis to a retaliation claim brought pursuant to Maryland law and Title VII. *See Hemphill v. Aramark Corp*., 2014 U.S. Dist. LEXIS 39809 (D. Md. 2014) (applying the *Nassar* but-for test to Maryland's Fair Employment Practices Act and common law claims). *See also, cf.*, *Nebozuk v. Abercrombie & Fitch Co, et al*., 2014 Ohio App. LEXIS 1543, at *34 (Apr. 15, 2014) *and Ernest Navy v. College of the Mainland*, 407 S.W.3d 893 (Tex. App. Houston 14th Dist. 2013) (both determining that *Nassar* applies to state-law claims when interpretation of those state-law claims is based on Title VII). It follows that the *Nassar* analysis should apply to all of Felt's retaliation claims.

**B.    Regardless Of Whether A Mixed Motive Or Single Motive Standard is Applied, Felt Cannot Prove A *Prima Facie* Case.**

### 1.    Felt Fails to Offer Any Facts to Show That Mortazavi and/or Sadeghi Decided To Terminate His Employment.

While application of the proper standard is, of course, fundamental, Felt cannot win regardless of what standard is applied. This is because there is *no*

31

*evidence* in the record from which a reasonable jury could conclude that a retaliatory motive was secretly embedded in his termination decision. Thus, the trial court was entirely correct in entering summary judgment on all of Felt's retaliation claims, regardless of what standard applies.

Simply stated, Felt's claims fail because he cannot establish any causation under the "but-for" or "motivating factor" tests. As argued by Felt, his retaliation case rests on the premise that a jury "could find" that MEIT Project Manager Keyvan Mortazavi and/or Task Lead Amir Sadeghi were the "primary decision makers" with respect to his removal from the ESES Contract. *See* Felt Appeal Brief at 13-14. This is because Felt acknowledges that all other key players from MEIT – Human Resources Director Sandra Stanford, General Counsel Barbara Pearson, Program Manager Dwight Yoder, and local HR staff – all knew about his July 30, 2010 charge of discrimination shortly after it was filed, well outside of the timeframe considered relevant for purposes of permitting an inference of retaliation. Appeal at 13-14. Recognizing this, Felt asserts (without evidence) that *it must have been* Mortazavi and/or Sadeghi who made the removal decision since they appear to have learned about his charge in March of 2011.[20] Felt's arguments fail.

---

[20] Moreover, it is disingenuous for Felt to accuse Sadeghi of retaliation based on temporal proximity alone, when it was he who informed Sadeghi in an email on March 9, 2011 about his July 2010 charge.

### 2. Felt's "Evidence" That Mortazavi and Sadeghi Were Decision-Makers Is Nonexistent.

The evidence shows conclusively that Sadeghi and Mortazavi had nothing to do with Felt's removal from the ESES Contract, and Felt offers no admissible evidence showing otherwise.  Felt's explanation of the reasons why he believes Mortazavi and Sadeghi might have made the decision to remove him from the ESES Contract is summarized on p. 14 of his Opening Appellate Brief:

> Appellant contends that, for the following reasons, Keyvan [Mortazavi] and Amir [Sadeghi] *are logically* the MEI individuals *who would have been primarily responsible for the decision to terminate Felt from the Contract.…* MEI Task Manager Amir and MEI Group Manager Keyvan were the MEI individuals solely responsible for managing on a day to day basis the personnel, including Felt and other DSFG employees, assigned to the Parts Lab.  As such, Keyvan and Amir were the MEI managers who had both direct contact with Dell employees and first-hand knowledge of the matters related to the performance and conduct of these Dell employees.  Accordingly, *it is logical to conclude* that, if MEI wanted to terminate a Dell employee assigned to Code 562*, the recommendation to do so, if not the actual final decision, would be made by Keyvan and Amir*.  Thus, out of all of the participating MEI individuals who could have been instrumental in the decision to terminate Felt from the Contract, Amir and Keyvan *are the most logical choices*.

Felt Appeal Brief at 14 (emphasis supplied).  But a review of the job responsibilities of these two individuals, plus the fact that MEIT had the contractual right to remove a DSFG employee from the ESES Contract, is a wholly

33

speculative and insufficient basis to conclude that one of these individuals ***actually made the removal decision***.  Under Fed. R. Civ. P. 56, a "mere scintilla" of evidence is not enough to defeat summary judgment, nor do conclusory or speculative allegations suffice.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 287 (4th Cir. 1999).  Felt's theory that Sadeghi or Mortazavi were the "logical" choices to be "instrumental in the decision to terminate Felt from the Contract" is precisely the type of conclusory or speculative assertion that is insufficient to survive summary judgment based on well-established law.  Because Felt offers absolutely no evidence upon which a jury could conclude that Sadeghi and/or Mortazavi were "decision-makers," his claim cannot succeed. [21]

---

[21] Felt implicitly acknowledges that he cannot establish a causal nexus involving any of the other MEIT or Dell managers due to the fact they learned of the July 2010 charge when it was filed (or did not know about it all until after Felt's termination).  An eight-month gap in time between a protected activity and termination, without more, is too long to support a retaliation claim in the Fourth Circuit and elsewhere.  *See, e.g., Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (thirteen-month interval between the charge and termination is too long to establish causation absent other evidence of retaliation); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001) (six month lag is sufficient to negate any inference of causation."); *see Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (citing with approval *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month nexus was too weak to justify inference of causation)); *Richmond v. Oneok, Inc.*, 120 F.3d 205 (10th Cir. 1997) *(*3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir. 1992) (four-month gap not sufficiently related to show retaliation); *Maldonado v. Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (rejecting retaliation claim because five-month lapse between complaint and

### 3.    Sadeghi and Mortazavi Were Well Aware of Felt's Long History of Complaints.

Even if there was some shred of evidence upon which a jury could conclude that Sadeghi and/or Mortazavi were decision-makers, no reasonable jury could conclude that Sadeghi and/or Mortazavi retaliated against Felt. This is because they were well aware of his long history of charges and complaints, having worked with Felt in the Parts Lab for years. Given this history, no reasonable jury could conclude that Sadeghi and Mortazavi suddenly decided to retaliate against Felt when, in March 2011, they learned of a charge of discrimination he had filed eight months earlier.

The undisputed facts in this case show that Felt engaged in years of protected activity without consequence. In fact, he alleges in this lawsuit that MEIT retaliated against him due to his July, 2010 charge, but in that charge, Felt alleged retaliation as a result of his September, 2008 harassment charge against MEIT. In turn, the September, 2008 charge alleged retaliation as a result of an unspecified earlier charge or lawsuit he filed against MEIT. Felt has literally been alleging retaliation by MEIT for years.[22] More absurdly, Felt has twice complained when he was ***not*** hired by MEIT, the party alleged by Felt to have

_____

termination was "not temporally close enough to raise an inference of a causal link").

[22] During that same time period, he also has repeatedly alleged discrimination and retaliation against him by both DSFG and NASA.

serially abused his civil rights. First he complained when he did not receive the position given to Ahmed Amin; then he complained when he was not re-badged. This beggars belief.

Employees who engage in long periods of protected activity without consequence cannot show their terminations were causally related to their protected activity simply by claiming the timing was suspicious, as Felt does here. Numerous courts have sensibly determined that the temporal proximity of plaintiffs' retaliation claims should be measured by the date of the plaintiffs' *first* complaint, not the *last*. *See Leitgen v. Franciscan Healthcare Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (finding the timing between the plaintiff's first protected complaint and her termination was too long for an inference of suspicious timing for retaliation purposes.); *Andreoli v. Gates*, 482 F.3d 641 (3rd Cir. 2007) (determining that the first instance of protected activity years earlier, in addition to the last instance of protected activity, was relevant for determining that no temporal proximity existed for causation purposes.); *Mittman v. City of Toledo*, 1998 U.S. App. LEXIS 17656 (6th Cir. July 28, 1998) (finding the plaintiff could not establish a claim for retaliation where the plaintiff engaged in a long history of protected activity and the supervisor's tolerance demonstrated "a willingness to retain employees who engage in protected activity, not a propensity to retaliate against them"); *see also Jones v. Continental Airlines, Incorporated,* 2005 U.S.

36

Dist. LEXIS 43219 (S.D. Tex. Sept. 14, 2005) (holding that the plaintiff used FMLA leave for several years before the termination and "it stretches the imagination that they waited until [years later] to retaliate against [the plaintiff]").

Here, Felt literally engaged in **years** of ongoing protected activity. Felt filed his first charge of discrimination against QSS [DSFG] in 2007 (and other charges and a lawsuit thereafter against DSFG and MEIT) and was not terminated until 2011 – four years later. As in *Mittman*, both MEIT and DSFG showed ample willingness to retain Felt (or, according to Felt's theory, refrained from interfering with his employment) when he engaged in protected activity.

Felt was never discharged, nor was he retaliated against in any other way, by Mortazavi or Sadeghi during his long history of protected activity.[23] Based on their well-established tradition of tolerating Felt's frequent discrimination and retaliation claims, no reasonable jury could conclude that Sadeghi and Mortazavi suddenly decided to retaliate against Felt. Accordingly, the Court should affirm Judge Motz entirely.

---

[23] Plaintiff initially claimed he received lower salary increases in 2007 or 2008, when he had engaged in protected activity. JA 649-50. But he now appears to acknowledge he has had steady salary increases throughout his employment with Dell and its predecessors. Felt Appeal Brief at 4.

### 4. Sadeghi and Mortazavi Also Knew About Felt's Complaint To MEIT In March Of 2010 Raising The Same Issues As Later Contained In His July, 2010 Charge.

Felt's claim that Sadeghi and Mortazavi retaliated against him in March 2011 based on his July 2010 charge fails for another reason:  it is undisputed that Sadeghi and Mortazavi knew about Felt's informal complaint, made directly to MEIT in March 2010, alleging the same retaliation claims that he raised in the July 2010 charge four months later. JA 103-5 (letter from Stanford to Felt showing that both Sadeghi and Mortazavi were interviewed in connection with her investigation). In order for a jury to find for Felt, therefore, it would need to conclude that even though Sadeghi and Mortazavi knew about Felt's many years of discrimination and retaliation complaints, and even though they knew about Felt's complaint of retaliation to MEIT in March, 2010, that when Sadeghi and Mortazavi belatedly learned about Felt's July, 2010 charge eight months earlier, they suddenly decided to retaliate against him although they had never done so before.  Felt's claim is implausible and is supported by no admissible evidence.

### 5. The Factual Record Clearly Shows Ample Legitimate Non-Discriminatory Reasons for Felt's Termination.

Numerous witnesses testified that Felt was discharged for a pattern of misconduct and repeated failures to accept responsibility for his actions.  Among other things, key personnel at both DSFG and MEIT genuinely believed Felt had failed to ensure the repair of a broken piece of equipment – the Zeiss SEM

38

backscatter, for which he was admittedly responsible as its "owner" – allowing it to be non-functional for several months. JA 77. This was one of the reasons given to Felt by his DSFG supervisor, Michael Scott, who discharged him. JA 77. Although Felt claimed he had reported the broken equipment to Production Control Manager Ratliff, he had never done so in writing, insisting that there was no requirement that he do so. JA 113-14. Ratliff testified that she had no recollection of any such report from Felt. JA 170-84. Sadeghi concluded that Felt had not followed protocol with respect to this incident. JA 93. MEIT's NASA customer interface, Jean-Marie Denis, was unhappy to learn during a meeting with Felt and a Zeiss representative that the equipment had been out of commission for several months. JA 189-90. Moreover, the issue was specifically mentioned in a NASA fee award letter, attracting the attention of Program Manager Dwight Yoder and others. JA 350-52. Yoder testified that "any time weaknesses of any magnitude shows up and particularly when it's addressing an individual, it's a significant issue in the government's eyes." JA 352. He also testified that this incident had cost MEIT a part of the award fee, although he could not quantify the amount. JA 353.

Although Felt minimizes the significance of the broken equipment, claiming it was an insufficient basis for his termination, that it was rarely used, and that other equipment could perform the same tasks, it is the employer's good faith

assessment of the seriousness of this incident, not Felt's, that matters, and it is clear all MEIT and DSFG witnesses felt this was a serious matter. "The crucial issue in a Title VII action," or any employment discrimination action, "is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir.), *cert. denied*, 516 U.S. 944 (1995). It is not the province of a federal court to determine whether MEIT's and DSFG's assessment of Felt's job performance was "wise, fair, or even correct," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation omitted), *cert. denied*, 531 U.S. 875 (2000), so long as the employer's action had no unlawfully discriminatory basis. In short, an employment discrimination claim "is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (citation omitted). *See also Lee v. Astrue*, 424 Fed. Appx. 262, 263 (4th Cir. April 22, 2011) ("[T]he district court correctly noted that it was Lee's supervisors' perception of his work performance that was relevant to its analysis, rather than Lee's self-assessment of his performance.") (*citing Evans v. Tech. Apps. & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")). Despite Felt's protests, it is clear that the "real" reason for Felt's discharge was the

fact that NASA, DSFG and MEIT genuinely believed Felt was responsible for this incident.[24]

In addition to the incident described above with the Zeiss backscatter, Felt's misconduct and failure to follow policy in the months leading up to his termination – some of which was reflected in a performance evaluation given to him the same day as his discharge – more than supported the termination decision. Most notably, Felt had blatantly lied about his trip to Neocera, claiming that it was Neocera's technician who had canceled the second leg of his trip on February 14, rather than Felt. JA 186-7.[25] Denis was unhappy about Felt's failure to complete his trip as planned, which resulted in additional cost and delay to the time-sensitive project. JA 189-90. Felt also lied about the reason he refused to meet with Sandra Stanford during her investigation. He claimed he was reluctant to enter the MEIT corporate offices, where he allegedly had been "harassed" in the past, but apparently had forgotten that he also had refused to meet with Stanford by phone.

---

[24] Even if, as Plaintiff claims, Michael Scott told him that his "prior behavior in speaking out to management about matters" was a factor, this does not negate the inescapable conclusion that retaliation was not a ***"but for"*** cause of his termination. Moreover, this statement is not, as Plaintiff contends, a recognition that any *protected activity* was a factor in his discharge; "speaking out to management about matters" could mean a lot of things. There is no evidence, other than Felt's self-serving speculation, that "matters" refers to protected activity.

[25] Having a proven history of lying to management should, on its face, provide MEIT and Dell with sufficient grounds to believe others over Felt.

JA 79, 135-36. Felt also refused to provide training to his colleagues on the Pernicka equipment as requested by Ratliff at the direction of Denis.  He also slammed Ratliff for using a "dictatorial tone" in her email, and accused her of "reprisal and threat, no doubt related to discrimination in the workplace." JA 164-66.

Felt regularly treated his colleagues with disrespect and disdain in other ways.  He accused Stanford of "intimidating" him when she tried to meet with him as part of her investigation. JA 139-41. He sought an "apology and other consideration" when Ratliff asked him to train others on the Pernicka.  JA 164-66. He was fixated on hierarchy within the lab; he repeatedly asked Stanford and HR Manager Deirdre Dietz whether Amin (whom he called "the Black") held a position that was "parallel, superior or subordinate" to his, so he would know how to "work with the new employee on a daily basis."  JA 78-9; JA 125 ¶24.[26]

From DSFG's perspective, Felt's performance was continuously subpar, and this subpar performance stretched over several years and several *different* supervisors.   JA 288.  DSFG received monthly complaints from MEIT – DSFG's customer – regarding Felt's performance.  JA 274.  Felt's most recent supervisor detailed Felt's "chronic issues" and described Felt as his "number one personnel

---

[26] Felt also apparently was not too happy that a "minority" candidate had been hired for the new position, just as he had complained repeatedly in the past of "reverse" discrimination. JA 46-55; JA 146 ¶ 23.

issue." JA 274; 277. This supervisor, Scott, delivered a subpar review to Felt before any contact between MEIT and DSFG Legal, when he had no knowledge of any charge against MEIT. JA 371. Logically speaking, it is therefore impossible for Scott's negative performance review of Felt to have been motivated by a desire to retaliate on the basis of a charge he knew nothing about. Notably, Felt does not accuse Scott of any unlawful conduct.

For all of these reasons, no reasonable jury could possibly find that Felt established a *prima facie* case on his retaliation claim. Further, as stated above, Felt had previously engaged in years of protected activity without being terminated. As in *Mallik*, Felt cannot show that his complaint of discrimination had any effect on the actions of MEIT or DSFG. Therefore, Felt cannot show that MEIT's and DSFG's demonstrated history of non-retaliation suddenly changed and was now the "but-for" reason for terminating Felt's employment. For all of these reasons, the decision of the trial court should be upheld.

### 6.    Felt Offers No Other Evidence Of Retaliatory Motive.

In addition to a lack of temporal proximity and a wealth of legitimate, nondiscriminatory reasons for his termination, Felt's retaliation claim also fails because he can point to no other possible evidence of retaliatory motive on the part of anyone at MEIT or DSFG.

When asked about Felt's history of filing discrimination and retaliation claims, Sadeghi, who had worked with Felt for several years, said:

> Well, to be honest, there were several cases back and forth. I was never privy to the nature of the case and which county, which state, but throughout the past few years, I've been providing the same type of answers in regards to performance and activities in the lab.

JA 587.  Yoder, who was two supervisory levels above Sadeghi, similarly testified that with respect to Felt's charges of discrimination, "this is not something that would stick out in my head as far as something that I would focus on …this would have been more as an FYI, just so you know in case somebody, you know, hits you.  If Goddard brings something up, as a PM you need to know as I do with many issues." JA 98-99.  Mortazavi testified he had "no idea what exactly took place" when Felt was fired, did not know who made the decision, and believes he learned about it after the fact.  JA 614-15. In sum, no witness who testified for MEIT expressed frustration or animosity towards Felt for filing his numerous claims.

Felt's appeal brief also points to a conversation between Stanford, Pearson, Yoder, Sadeghi, and Mortazavi where they discussed NASA raising issues with Felt and they also addressed the fact that Felt had pending charges of discrimination.  However, a review of the record cited by Felt shows that neither Sadeghi nor Mortazavi made any recommendation to terminate Felt:

A.  With Mr. Felt's prior charges, since we at that time still had open charges with the EEOC of Prince George's, they weren't sure what the appropriate course of action was, so they wanted me and Barbara to get involved and work with Dell to come up with a solution.

Q.  Did either Amir or Keyvan have any suggestions of what they wanted to have done?

A.  No.

Q.  What do you recall the next step was after you had that meeting?

A.  I believe at this time I requested Amir to prepare a summary of the things that we had talked about on the phone call.  So during the phone call he had given several examples of the issues with Mr. Felt, and I asked him to put those in writing so that I would have a better understanding of the issues that were going on.

JA 472.  Further, this record also shows that neither Sadeghi nor Mortazavi were involved in the decision-making as to Felt.  Both acted as sources for MEIT to gather information with respect to Felt's performance concerns.  This also shows that since Sadeghi and Mortazavi knew of Felt's continuous protected activity, they also knew any decisions regarding him would have to be handled at a higher level than themselves.    Accordingly, Felt cannot show that Sadeghi and Mortazavi's participation in this conversation is evidence of any motive to retaliate whatsoever.

With respect to DSFG, there is absolutely no evidence that any DSFG personnel had any desire to retaliate against Felt.   There are no emails, no

45

testimony and no documents in which DSFG expresses any desire or intention to retaliate for any of the various charges of discrimination filed by Felt over the years. In fact, DSFG lobbied to keep Felt as an employee in late December 2010 because Felt was one of its most profitable employees on the ESES Contract.

In fact, Rittinger undertook a specific investigation to determine if Felt's performance warranted removal from the ESES Contract *on the merits*. SOF 58-74. Rittinger knew of Felt from a prior lawsuit, and any suggestion that he waited almost three years to suddenly retaliate against Felt as a result of a charge filed against MEIT is ludicrously speculative. *E.g., Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998) (a plaintiff cannot defeat a motion for summary judgment by resorting to speculation or through a compilation of inferences). Tellingly, Felt's arguments on appeal make no serious effort to implicate any agent or representative of DSFG in a retaliatory scheme.

## C. Even Had Felt Established A *Prima Facie* Case Of Retaliation, The Evidence Established A Legitimate, Non-Retaliatory Explanation For Felt's Termination.

Even had Felt established a *prima facie* case of retaliatory termination (which he clearly did not), if DSFG produced legitimate non-retaliatory reasons for its decision to remove Felt from the ESES Contract, then Felt's claims must fail absent some evidence the proffered reasons were pretexual. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). As discussed above in part B(5) hereof, DSFG

46

had abundant non-retaliatory reasons to remove Felt from the ESES Contract, including: Felt's low performance reviews, consistent complaints from DSFG's customers MEIT and NASA, Felt's "chronic" performance issues observed by Scott, the list of performance issues compiled by MEIT, the mention of the equipment that Felt supervised in the fee award letter from NASA, as well as the contractual obligation of DSFG to remove any employee from the ESES Contract at the request of MEIT.[27] The evidence thus demonstrates that DSFG had multiple, valid, non-discriminatory reasons for terminating Felt. More importantly, there is no evidence in the record to show that any of the protected activities that Felt alleges he engaged in were either the "but-for" cause or a motivating cause of his termination from DSFG.

Against this overwhelming evidence, Felt cannot establish that DSFG's proffered reasons for its actions against Felt were pretextual. To establish pretext, Felt must show not only that DSFG's asserted reasons for its employment

---

[27] MEIT and DSFG acknowledge that there are differing recollections among the witnesses as to what person or persons made the termination decision. However, as Judge Motz correctly found, any dispute over this issue is not material. Notwithstanding the identity of the actual decision-maker, the record shows complete consistency among the witnesses as to the reasons for Felt's discharge, *and none of those reasons involved unlawful motives*. Further, even in the light most favorable to Felt, the factual record shows ample, ongoing, significant misconduct and policy violations that are more than sufficient to support the reasons Felt was given for his termination. No reasonable jury could possibly conclude that Felt's removal from the contract, and consequent termination, was retaliatory, for all of the reasons stated herein.

decisions are not true, but also that those decisions were, in fact, made ***because of***

***protected activity***.  *Tuttle v. McHugh*, 457 Fed. Appx. 234, 237 (4th Cir. 2011);

*O'Connor v. Consolidated Coin Caterers Corp.*, 84 F.3d 718, 719-20 (4th Cir.

1996).  In this case, it is irrelevant whether Felt's removal from the ESES Contract

and termination would not have happened "but-for" a desire to retaliate against

Felt, or whether retaliation was a motivating factor.  Felt has adduced no genuine

issue of material fact as to pretext.  Rather, he spends most of his time simply

arguing whether the termination decision was wise business judgment, or mistaken

business judgment.  This is not grounds for reversal.  *See Cramer v. Intelidata*

*Technologies Corp.*, 168 F.3d 481, 1998 WL 911735, at *4 (4th Cir. Dec., 31,

1998) (citing *Jiminez v. Mary Washington College*, 57 F.3d 369, 383 (4th Cir.

1995)); *Rudolph v. Hechinger, Co.,* 884 F. Supp. 184, 188 (D. Md. 1995) ("Title

VII (does) not protect against unfair business decisions - only against decisions

motivated by unlawful animus"); *Kariotis v. Navistar Intern. Transp. Corp.,* 131

F.3d 672, 680 (7th Cir. 1997) ("Discrimination statutes allow employers to

discharge employees for almost any reason whatsoever (even a mistaken but

honest belief) as long as the reason is not illegal discrimination. Thus when an

employee is discharged because of an employer's honest mistake, federal anti-

discrimination laws offer no protection.").  This Court made clear that even

evidence of pretext is not sufficient to survive summary judgment if there is not

sufficient evidence that the employer was motivated by an unlawful retaliatory (or discriminatory) motive. *Price*, 380 F.3d at 217. Under these standards, Felt cannot establish pretext under any set of facts.

**D.    Felt Failed to Preserve His Tortious Interference Claim Against MEIT On Appeal.**

Felt's Appeal fails to challenge the grant of summary judgment on his claim of tortious interference against MEIT. Accordingly, that claim is not preserved on appeal and the Court should affirm the grant of summary judgment on that count.

## <u>CONCLUSION</u>

For the foregoing reasons, MEIT and DSFG respectfully request the Court affirm the District Court's grant of summary judgment and dismiss Felt's claims with prejudice.

49

Respectfully Submitted,

*/s/ Joel Jacob Borovsky*
Joel Jacob Borovsky
Teresa Burke Wright
Jackson Lewis, LLP
10701 Parkridge Boulevard, Suite 300
Reston, Virginia 20191
(703) 843-8315

*Counsel for Appellee MEI Technologies, Inc.*

Joanna Lee Faust
Timothy Joseph Mcevoy
Cameron McEvoy, PLLC
11325 Random Hills Road, Suite 200
Fairfax, Virginia 22030
(703) 460-9341

*Counsel for Appellee Dell Services Federal Government, Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

No. 14-1079          **Caption:** Federick Felt v. MEI Technologies, Inc., et al.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑    this brief contains _____12,459_____ *[state the number of]* words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____ *[state the number of]* lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑    this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 *[state name and version of word processing program]* in
14-Point Times New Roman *[state font size and name of the type style]; or*

☐    this brief has been prepared in a monospaced typeface using
_____ *[state name and version of word processing program]*
with _____ *[state number of characters per inch and name of type style]*.

(s) Joel J. Borovsky _____

Attorney for MEI Technologies _____

Dated: 5/19/2014 _____

Rev. 03/03/11

# CERTIFICATE OF SERVICE

I certify that on  May 19, 2014          the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Mitchell Ira Batt
SULLIVAN TALBOTT & BATT
77 South Washington Street
Suite 304
Rockville, MD 20850-0000
301-340-2450
mbatt@verizon.net

Joel J. Borovsky

—————————————————

Signature

5/19/2014

—————————————————

Date